IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

DIANA S. MYERS, et al.,

                Plaintiff,        Case No. 3:05 CV 7278

  -vs-

                                    MEMORANDUM OPINION

VILLAGE OF ALGER, OHIO,

                Defendant.

KATZ, J.

This matter came before the Court on Plaintiffs' Motion for a Temporary Restraining Order (Doc. No. 2). On July 20, 2005, the Court began a combined temporary and preliminary injunction hearing, which was continued and completed on July 29, 2005. Upon Plaintiffs' request and without objection by the Defendant, the injunction hearing was consolidated with trial on the merits, under Federal Rule of Civil Procedure 65(a)(2). The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. As explained below, the Court determines that judgment in favor of Defendant is appropriate on all of Plaintiffs' claims. Also before the Court is Plaintiffs' Motion to Stay Proceedings (Doc. No. 21), which the Court denies as moot.

## BACKGROUND

Plaintiff Diana Myers ("Mrs. Myers") owns real property located at 108 East Belmont Street, in the Village of Alger, Ohio ("the Village"). Mrs. Myers has a home on the property, where she lives with her husband Paul ("Mr. Myers"), who is also a Plaintiff in this action. The Plaintiffs seek to restrain the Village from requiring them to tie into its new water system. Though

Mr. Myers is not an owner of the property, the water and sewer service is in his name.[1] The Plaintiffs have lived in their home since August of 1996. Mrs. Myers testified that the value of her property is approximately $75,000.

Since 1990, the Village has been in the process of constructing a new water system to replace its seventy-seven-year-old network of water lines. The project was divided into three phases that were all supposed to be completed in the early 1990s. However, former officeholders bungled state grant applications, and the village is just now concluding the final phase. Phase I involved the construction a new water main. Phase II, completed in 1991, involved the laying of replacement pipes in the northern half of the Village. Phase III completes the renovation, replacing the remaining water pipes in the southern half of the Village.

The Myers property lies on the south side of Belmont Street, an east-west street just inside the southern boundary of the Village of Alger. It is in the area affected by Phase III of the pipe-replacement project. The Plaintiffs have previously been served by the Village's old water system via a water line running underneath Belmont Street, in front of their property. Instead of replacing the water line underneath Belmont Street, the Village has placed a new water line in the Village-owned, grass-covered "alley" that runs parallel to and south of Belmont Street, behind Plaintiffs' property. The alley marks the southern boundary of the Village of Alger. Though there is already a pipe running from the front of Plaintiffs' house to the old Village water line underneath Belmont Street, connecting to the new water system would require Plaintiffs to run a new pipe from the

---

[1] Because it finds in favor of Defendant on all of Plaintiffs' claims, the Court need not address the issue of Mr. Myers' standing.

back of their house to the new Village water line in the alley. Mr. Myers testified that the cost to do so would be about $2,000.

While the original 1990 plans called mostly for the new water lines to run under the Village's streets, engineers realized prior to Phase II that the Village could save money by running new lines down the alleys. Maps produced by the Village indicate that residents in the phase II area were commonly required to tie into the new system in alleys. Mrs. Myers testified that in 1996 she first became aware that the Village's water system replacement plan called for the new water line serving her portion of Belmont Street to go through the alley behind her property.

The Village Council has established, under Ohio Revised Code § 735.28, a Board of Public Affairs ("the BPA") to manage the Village's water system. The BPA operates the water plant and sets water-service rates. At the May 15, 2000 meeting of the BPA, member Brian Tyson questioned why the new Belmont Street water line would run down the alley as opposed to down Belmont Street. Board minutes show that several board members and citizens in attendance weighed in on the issue. Mr. Tyson expressed concern that there were garages and brush in the alley. Mr. Myers referred to a petition he had filed requesting that the line be placed under Belmont Street instead of in the alley. Truman Fry, a member of the Village Council, stated at the BPA meeting that lines were placed in alleys in Phases II and III because to do so cost less than tearing up the streets and routing water lines around existing sewer lines. The BPA agreed to contact an engineer about the issue.

On July 11, 2000, the Village Council, aware of the proposed change to the plan, passed an ordinance that the line serving the portion of Belmont Street in question would remain in the alley.

3

Councilman Truman Fry testified that as a member of the Village Council, he supported the measure because of the cost-savings resulting from use of the alley.

At the BPA's July 17, 2000 meeting, an engineer from Jack Jones Engineering made a presentation about the pros and cons of placing the waterline in the alley and the street, respectively. Meeting minutes reflect that the advantages of using the street included: easier access for maintenance and hydrants; the lack of obstacles like structures or fences; easier detection of leaks; and easier placement of curb valves. The stated disadvantages of using the road were: conflicts with other utilities; interruption to road use and emergency vehicle travel during construction; and a higher cost per foot. On the other hand, the alley's advantages were: the absence of conflicts with other utilities; lower cost per foot; and lack of any need to reroute motorists and emergency vehicles. The alley's disadvantages were: the need for hydrant extensions; the need to move existing sheds and fences; the need for new service extensions; the difficulty of maintaining the alley line; the difficulty of locating valves; and the need for easements for hydrant lines. The engineer told the BPA that there was no "right" or "wrong" answer.

On September 11, 2000, the BPA passed a resolution, two-to-one, that the master plan be changed so the line ran under Belmont Street; however, the Village Council did not adopt the resolution. Both Fry and BPA President Doyle Hale testified that the Village Council had in the past overruled resolutions of the BPA. Hale testified that, regarding the water-pipe project, the Village Council exercises ultimate authority, that the BPA functions in an advisory capacity, and that the BPA had attempted to change the water-pipe replacement plans before by recommending that pipes be moved, but that the Village Council had not adopted those recommendations.

On June 28, 2005, Plaintiffs received a notice stating that, per a vote at the June 6, 2005 Village Council meeting, the Village would require them (along with all residents "south of the old railroad bed") to hook into the new water pit in their alley by July 8, 2005, ten days hence.[2] *See* (Doc. No. 1., ex. A). On July 7, 2005, the Plaintiffs filed this lawsuit, seeking declaratory and injunctive relief and $250,000 in compensatory damages.

The relationship between the Plaintiffs, particularly Mr. Myers, and the Village, and particularly with Councilman Fry, is replete with litigation and animosity. In May of 1996, Mr. Myers initiated a criminal complaint against Fry, who was indicted on charges involving theft in office, and plead no contest. Mr. Myers has also initiated several petitions challenging actions of the Village Council, including petitions relating to pay raises for Village employees and annexations to the village. These petitions caused the issues to be placed on ballots as referenda, and in both cases, the actions of the Village Council were voted down by Village residents. Additionally, Mr. Myers filed a lawsuit alleging a "sunshine law" violation, which resulted in the issuance of an injunction in Mr. Myers' favor and an award of attorneys' fees. He filed a motion for a writ of quo warranto with the Ohio Supreme Court, which resulted in a Village official being removed from office.

In July of 1997, after Mr. Fry moved at a Village Council meeting to have the alley behind Belmont Street bulldozed, four families, including the Plaintiffs, filed a lawsuit seeking to force the Village to abandon the alley. On the first hearing date, the Chief of Police cited Mr. Myers for criminal damaging for pulling stakes out of the ground. The criminal action was dismissed; the

---

[2] Plaintiffs do not claim in their Complaint that this notice was improperly served under the Ohio Revised Code.

5

four families lost their lawsuit. When the Village destroyed some buildings in the alley, Mr. Myers filed a lawsuit in federal court alleging a taking of private property for public use without just compensation. The District Court dismissed his complaint, and the Sixth Circuit affirmed. *Myers v. Village of Alger, Ohio*, No. 03-4028, 102 Fed. Appx. 931 (6th Cir. June 17, 2004).

At some point, Mr. Myers made a complaint about the condition of Mr. Fry's mother's property, and, shortly thereafter, Mr. Myers testified, Mayor Donald Hensley falsely accused Mr. Myers of having a vicious dog on his property. Also at some point, Mr. Myers and Mr. Fry had an altercation in the parking lot of a Kroger store in Kenton, Ohio. The Alger Chief of Police confiscated Mr. Myers' guns, and Mr. Myers was convicted of assaulting Mr. Fry. The Village and Mr. Myers have also had a dispute over an allegedly unpaid water bill, in which the Village accused Mr. Myers of forging a receipt.

In March of 2005, Mr. Myers complained to the Ohio Environmental Protection Agency that the Village had laid a new water pipe in a north-south alley near his property too close to a sewer pipe, and the EPA required the Village to move the pipe. In April of 2005, the Village's Chief of Police issued Mr. Myers a citation for trespassing in a construction zone in an alley, however, the citation was incorrectly filled out, so the prosecutor did not pursue the matter. When the Village installed the Plaintiffs' new water pit in early July, 2005, Mr. Myers told Village Inspector Robert Bailey that he did not care where the pit was put, because he was not going to connect to it anyway. Finally, Mrs. Myers, who is of Mexican ancestry, testified that she has received anonymous letters containing racially harassing statements, but does not know who sent them.

## DISCUSSION

Plaintiffs claim in Counts I and II of their Complaint that the Village has violated their Equal Protection and Due Process rights. In Count III, they claim that the Village's actions violate the Ohio Revised Code "in that the Village Council is without authority to interfere, on a one-time basis, with the actions of the BPA." The Court finds that judgment in favor of Defendant is appropriate as to all of Plaintiffs' claims.

*A. Equal Protection*

Plaintiffs claim the Village is attempting to require them to tie into the new water system in the rear alley in retaliation for Mr. Myers' past personal and political activities. When a plaintiff brings an equal protection claim as a "class of one," to succeed the plaintiff must show that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in the treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Here, the Plaintiffs have failed to show that, by requiring them to tie into the new water system at the back of their house in an alley, the Village treated them differently from others similarly situated. Four neighbors on each side of Plaintiffs have already tied into the alley line, and many Alger residents affected by Phase II of the water-pipe replacement project also tied into the new system in rear alleys.

Moreover, while the Plaintiffs and the Village have a history of animosity, Plaintiffs have not shown that the Village's action as to them was intentional or irrational. Plans called for their property to be served via the rear alley before the Plaintiffs even moved into their home. The trial record shows that the considered decision of the Council to pass an ordinance keeping the line in the alley was based on cost-savings to the Village and logistical advantages. The decision was rational, because using the alley allowed the Village to avoid interfering with other utility pipes

7

and to avoid tearing up and replacing the pavement. Because the evidence does not establish that the Village violated Plaintiffs' equal protection rights, judgment in favor of Defendant on that claim is appropriate.

*B. Procedural Due Process*

Plaintiffs also claim that the Village Council's rear tie-in requirement violates their procedural due process rights. The Fourteenth Amendment prevents states from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend. 14 § 1. When government deprives someone of a property interest, it generally must provide the person with notice and an opportunity to be heard. *Flaim v. Med. College of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005). "Governmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard. But, when a relatively small number of persons are affected on individual grounds, the right to a hearing is triggered." *Nasierowski Bros. Inv. Co. v. Sterling Heights*, 949 F.2d 890, 896 (6th Cir. 1991).

In *Nasierowski*, the city developed and published a new zoning plan. *Id*. at 892. As it was being adopted, a councilman insisted, for personal reasons, that the recommended ordinance be amended to rezone a narrow strip of land to a more restrictive classification. *Id*. The Council adopted the ordinance with the councilman's proposed amendment. *Id*. The Sixth Circuit found the case to be identical to *Harris v. County of Riverside*, and quoted with approval the Ninth Circuit's opinion in that case, as follows:

> "The County's consideration of the vast area contemplated by the [new general zoning ordinance] certainly affected a large number of people and would not ordinarily give rise to constitutional due process requirements. Within the County's amendment process, however, the County specifically targeted Harris' property for a zoning change after notice had been published for the [new ordinance]. . . . The record supports the conclusion that the County undeniably knew the use Harris was

8

> making of his property when it acted to change the zoning on his land. Under the facts of this case, the County's decision to alter its proposed [new ordinance] specifically to rezone Harris' land constituted a decision which was distinct from, rather than a part of approval of the [new ordinance]. This decision, in contrast to approval of the [entire new ordinance], concerned a relatively small number of persons (Harris and the immediately adjacent landowner) rather than the entire population of the West Coachella Valley."

*Nasierowski*, 949 F.2d at 896 (6th Cir. 1991) (quoting *Harris v. County of Riverside*, 904 F.2d 497, 502 (9th Cir. 1990)) (alterations in *Nasierowski*). The *Nasierowski* court found that while no due process requirements were triggered by the adoption of the city-wide plan, the alteration, without notice and an opportunity to be heard, of the published proposal in a way specifically calculated to disproportionately burden the plaintiff violated the plaintiff's due process rights.

Here, the development of the Village's water-pipe replacement plan, which called for rear-alley tie-ins in many locations throughout the project, including on Belmont Street, was akin to the adoption of the city-wide zoning ordinance: it was a legislative act affecting a large number of people. It therefore did not trigger due process requirements. Unlike the alteration of the larger plan in *Nasierowski* and *Harris*, the Village Council's July 11, 2000, ordinance and subsequent refusal to adopt the BPA's proposed alteration of the Village-wide plan had the effect of confirming rather than changing that plan. Additionally, there is no evidence in this case that the Village Council acted with the intent to affect one or a few landowners more detrimentally than others. Rather, the testimony indicates they were persuaded to "overrule" the BPA's contemplated spot-alteration because of the financial savings that resulted from placing the water lines in alleys. Therefore, the Court concludes that the Village has not violated Plaintiffs' procedural due process rights.

*C. Substantive Due Process*

9

Plaintiffs further claim that the Village's requirement that they tie into the new water system via a new hook-up in their rear alley violates their Fourteenth Amendment due process rights. As the Third Circuit has explained in a case factually similar to this one:

> [W]hen "general economic and social welfare legislation" is alleged to violate substantive due process, it should be struck down only when it fails to meet a minimum rationality standard, an "extremely difficult" standard for a plaintiff to meet. The only question is "whether the law at issue bears any rational relationship to any interest that the state legitimately may promote"; simple unfairness will not suffice to invalidate a law. The challenger bears the burden of proving irrationality.

*Stern v. Halligan*, 158 F.3d 729, 731 (3d Cir. 1998) (internal citations omitted) (quoting *Knight v. Tape, Inc.*, 935 F.2d 617, 627 (3d Cir. 1991)). Moreover, "[m]andatory connections to public utilities are classic examples of social welfare regulations that merely adjust the burdens and benefits of life in the modern world. . . . [F]rom the inception of such sanitary programs--and even during the *Lochner* era--courts have routinely rejected constitutional challenges to mandatory connection requirements." *Id*. at 734.

In *Stern*, a New Jersey township required its residents to tie into its new, municipal water system and to permanently disconnect and cap their old, private wells. *Id*. at 730. The costs of tying in and capping the wells fell on the residents, who claimed the ordinance requiring them to do so was irrational and therefore violative of their substantive due process rights. *Id*. at 730-31. The Third Circuit found the township's goal was to protect the "health, safety, and general welfare" of its inhabitants, which was "plainly in the public interest." *Id*. at 732. The court cited cases from several jurisdictions holding that regulating the water supply and requiring residents to connect to a municipal system are legitimate exercises of the police power, even where there is no immediate hazard to the alternative water supply. *Id*. at 732-33. The Third Circuit was not disturbed by the township's additional requirement that residents disconnect and cap their private

wells at their own expense, finding that the "slight additional burden" made no difference to the outcome of the case. *Id*. at 733.

Here, the Village's implementation of a new water system to replace its seventy-seven-year-old network of pipes is consistent with its goal to provide safe and effective water service. As in *Stern* and the cases therein cited, requiring Village residents to tie into the new system bears a rational relationship to that legitimate goal. This case is similar to *Stern* in that the Village's requirements place an additional burden on many residents: the running of new connecting pipes to rear alleyways. As in that case, however, the additional burden makes no difference: after considering the cost of replacing the under-street pipes and the inevitable conflict with other utility lines, including sewer pipes, that would entail, the Village has rationally determined that the placement of the pipes in the alleyway best serves its interest in providing water service to the public. Plaintiffs have not shown the Village acted irrationally; thus, they have not shown that the Village violated their due process rights. Judgment for Defendant is appropriate.

*D. Taking*

The Fifth Amendment prohibits the taking of property for public purposes without just compensation. U.S. Const. amend. 5. The Supreme Court has explained that the takings clause aims to prevent the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). The government need not physically take property for the clause to apply: when "a regulation goes too far, it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

Where a regulation deprives a property owner of less than the property's full economic value, to determine whether a taking has occurred courts undertake "an ad hoc, factual inquiry into three significant factors." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 483 (6th Cir. 2004) (internal quotation omitted). The first factor is "the economic impact of the regulation on the claimant," which may be measured in terms of the property's loss in market value, the continuing commercial impracticability of the owner's operation, and the opportunity to make other economic uses of the property and still earn a reasonable rate of return. *Id*. The second factor is "the extent to which the regulation has interfered with distinct, investment-backed expectations." *Id*. The third factor is "the character of the governmental action," i.e., whether the action accompanies a physical occupation of property and whether there is a legitimate public purpose for the regulation. *Id*.

It is unclear whether Plaintiffs argue that the Village has effected a taking of the money it will cost them to comply with its rear tie-in requirement, or of their real property, to which the requirement relates. The Court will consider both possibilities.

A reasonable fee required for government services, even those a recipient is forced to use, does not constitute a taking. *United States v. Sperry*, 493 U.S. 52, 63 (1989). Whether the Plaintiffs pay a third-party contractor to tie their home into the alley water line, or whether the Village runs the line itself and assesses the costs against the Plaintiffs, as it may under Ohio Revised Code § 729.06, the result is the same: the Plaintiffs are required to spend money in order to receive a city service. That Plaintiffs have no choice in the matter is irrelevant: they benefit by receiving improved water service nonetheless. *See id*. Therefore, the Village's requirement that

the Plaintiffs tie into the new water system at their own cost does not constitute a taking of the money they must expend to do so.

As to Plaintiffs' real property, there is no evidence that the new water line will adversely affect their property value, or that they possessed any investment-backed expectations regarding their water service. Plaintiffs do not allege a physical taking. Moreover, as discussed above, there is a legitimate purpose for the Village's actions. Indeed, Plaintiffs have failed to articulate what, other than the money it will cost to comply with the Village's regulations, the Village has taken. The Court finds no taking has occurred.

*E. Ohio Revised Code*

In Count III of their complaint, Plaintiffs claim that when the Village Council passed an ordinance requiring that the water line serving Belmont Street remain in the alley, it violated the Ohio Revised Code. Plaintiffs claim that the "Village Council is without authority to interfere, on a one-time basis, with the actions of the BPA to the harm and detriment of the plaintiffs." (Doc. No. 1, ¶ 14). Plaintiffs' claim fails for several reasons.

First, the Ohio Revised Code provides that the BPA:

[S]hall manage, conduct, and control the waterworks, electric light plants, artificial or natural gas plants, or other similar public utilities, furnish supplies of water, electricity, or gas, collect all water, electric, and gas rents or charges, and appoint necessary officers, employees, and agents.

The [BPA] may make such bylaws and rules as it determines to be necessary for the safe, economical, and efficient management and protection of such works, plants, and public utilities. These bylaws and rules, when not repugnant to municipal ordinances or to the constitution or laws of this state, shall have the same validity as ordinances.

Ohio Rev. Code § 735.29. Notably, while this section requires the BPA to run the water plant, furnish water to residents, and collect fees therefor, and allows it to make bylaws and rules

necessary to accomplish those tasks, the statute does not, as Plaintiffs believe, grant the BPA, to the exclusion of the Village Council, unfettered authority over capital improvement projects such as water-pipe replacements.

Second, Plaintiffs are incorrect that the Village Council "interfered" with the actions of the BPA. Doyle Hale, president of the BPA, testified that when the Village Council passed its July 11, 2000, ordinance, the Village's plans called for the Belmont Street line to run down the alley. The ordinance confirmed the plan; when passed it did not contradict any action of the BPA. Moreover, when the BPA took action on September 11, 2000, it passed not a bylaw or rule, but a resolution containing a recommendation to the Village Council that the line be moved. The Village Council chose not to adopt the BPA's recommendation.

Finally, in any event, bylaws and rules made by the BPA are valid only if "not repugnant municipal ordinances." Here, the BPA's September 11, 2000, resolution was directly contradictory to the Village Council's July 11, 2000, ordinance. The Court finds that Plaintiffs' § 735.29 claim is without merit.

Additionally, the Plaintiffs claim, in paragraph nine of their complaint, that the June 28, 2005 notice requiring them to connect was improper because, under Ohio Revised Code § 729.06, "the factually specific predicates for any action by Village Council do not exist." (Doc. No. 1, ¶ 9). Section 729.06 provides, in part:

> Whenever the legislative authority of a municipal corporation deems it necessary, in view of contemplated street paving *or as a sanitary regulation*, that sewer or water connections or both be installed, the legislative authority shall cause written notice thereof to be given to the owner of each lot or parcel of land to which such connections are to be made, which notice shall state the number and the character of connections required.

14

Ohio Rev. Code § 729.06 (emphasis added). Because the effective provision of drinking water certainly qualifies as a sanitary regulation, Plaintiffs' § 729.06 claim fails as well.

## CONCLUSION

Based on the foregoing, the Court determines, after trial on the merits, that judgment in favor of the Defendant is appropriate on all of Plaintiffs' claims. Plaintiffs' Motion to Stay Proceedings (Doc. No. 21) is denied as moot.

IT IS SO ORDERED.

                                                        s/ *David A. Katz*
                                                        DAVID A. KATZ
                                                        SENIOR U. S. DISTRICT JUDGE